**Affirmed and Opinion Filed October 24, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00813-CV**

**EMILY ABNEY-ACOSTA, Appellant**
**V.**
**ROBERT SANTAELLA, M.D., Appellee**

**On Appeal from the 471st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 471-00494-2020**

## MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Nowell
Opinion by Justice Nowell

Emily Abney-Acosta sued Robert Santaella, M.D., a general surgeon, for negligence after a surgical sponge was left inside her body and remained undetected for several months. The case proceeded to trial, and the jury found Santaella was not negligent in his treatment of Abney-Acosta. On appeal, Abney-Acosta argues the evidence is legally and factually insufficient to support the jury's verdict and the trial court erred by refusing to submit separate jury questions on her claims. We affirm the trial court's judgment.

SUFFICIENCY OF THE EVIDENCE

The uncontested evidence shows Santaella surgically removed a mass from Abney-Acosta's abdomen, and a sponge remained in her abdominal cavity after the surgery. During the months following the surgery, Santaella and other physicians aspirated a seroma that developed at the surgical site but did not identify the retained sponge. Approximately seven months after the surgery and after the wound had healed, Abney-Acosta experienced abdominal pain and Santaella ordered a new CT scan. Rather than having the CT scan performed, Abney-Acosta sought a second opinion. The new doctor identified the retained sponge and surgically removed it, thus resolving Abney-Acosta's symptoms. The jury did not find Santaella was negligent.

In her first issue, Abney-Acosta argues the evidence is legally and factually insufficient to support the jury's verdict. "When a party attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue." *Catholic Diocese of El Paso v. Porter*, 622 S.W.3d 824, 834 (Tex. 2021). To conclusively establish a fact, the evidence "must leave no room for ordinary minds to differ as to the conclusion to be drawn from it." *Id.* When a party attacks the factual sufficiency of an adverse finding, we examine the entire record and set aside the jury's verdict only if it is so contrary to the overwhelming weight

of the evidence as to be clearly wrong and unjust. *See Hizar v. Heflin*, 672 S.W.3d 774, 795 (Tex. App.—Dallas 2023, pet. filed).

In making this review, we are not a fact finder. The fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We defer to the jury's implicit determinations of credibility and the weight to be given to the evidence. *Wise v. SR Dallas, LLC*, 436 S.W.3d 402, 408-09 (Tex. App.—Dallas 2014, no pet.).

### A.     Surgery

Abney-Acosta consulted Santaella in August 2018 because she felt a small mass in her abdomen and had abdominal pain she rated as an eight on a ten-point scale. A CT scan confirmed the mass in her abdomen, and Santaella surgically removed the mass on Friday, September 21, 2018.

As a general practice, before surgery, the scrub technician counts the instruments needed for the surgery and the circulating nurse documents the count. During Abney-Acosta's surgery, Darwin Bailey was the surgical technician and Aubrey Magras was the circulating nurse. The instruments Bailey brought into the operating room included Ray-Tec sponges. Santaella testified he uses the sponges for retraction and absorption of "blood contents," and they "are coming in and out of the wound" during surgery. Explaining how the surgical team tracks sponges, Bailey testified: "If we put the sponge in the cavity, we're just like 'Ray-Tec in,' and

that's to let the [circulating] nurse over there know that we've done it. . . . And then once it comes out, 'Ray-Tec out.'"

Before the surgeon closes the wound, all sponges and other tools are set out for the scrub technician and the circulating nurse to count independently. At the end of surgery, the circulating nurse must sign a Comprehensive Surgical Checklist, which includes a check box for "Completion of sponge, sharp, and instrument counts"; in this case, the nurse checked "Yes" and signed the form. On the same checklist, the nurse checked "No" in response to the question, "Any equipment problems to be addressed?" The surgeon does not sign the form.

At the end of Abney-Acosta's surgery, Bailey told Santaella that all sponges were accounted for; his statement was incorrect and one sponge remained in Abney-Acosta's body. Bailey testified that, if he had known the sponge count was wrong, he would have communicated that information to Santaella; surgeons wait to close the patient's incision until they are notified the sponge count is correct. Bailey testified he is responsible for ensuring the sponge count is correct, and stated: "I should have done a better job." He testified surgeons do not count sponges: "that's not their job. Their job is to go in there and fix those people." Bailey agreed the surgeon is the "first line of defense" to track instruments and the sponge count is a method to confirm the instrument counts the end of surgery. Santaella also testified Bailey was responsible for counting the sponges, and Santaella was not.

Santaella testified surgeons do not participate in counting sponges before or after the surgery, and he "definitely depends on" the sponge count. However, before closing any surgical incision, Santaella inspects the incision for retained instruments, including sponges; he inspected Abney-Acosta's incision before closing. Santaella testified that, if Bailey had told him the sponge count was off, then he would have re-examined the area and, if he did not find the sponge, then he would have brought in an x-ray machine to find the sponge before he closed.

Santaella speculated that, as part of Abney-Acosta's surgery, he divided the abdominal muscle and the muscle retracted. "And so the only way I feel like we could not have seen this Ray-Tec or palpitated it is that it retracted down the muscle. . . . because we definitely could not see or feel that mass at all." He explained the Ray-Tec sponges are absorptive and become the color of the liquid around them, and the sponges feel similar to surrounding tissue.

Before surgery, Santaella's office told Abney-Acosta that her recovery would require two to three days. At trial, Santaella agreed the recovery time for an ambulatory surgery such as Abney-Acosta's "would probably be within that range" barring any complications. Santaella prescribed about one week of pain medication, and he expected Abney-Acosta would not need more barring any complications from surgery. Abney-Acosta did not request any pain medication refills.

### B. Post-Operative Care

Abney-Acosta experienced pain and swelling at the surgical site during the weekend after surgery and the following week. On Saturday, September 29, Abney-Acosta went to the emergency room and was admitted to the hospital. A CT scan was performed while she was hospitalized, and Dr. Henry Chen, a diagnostic radiologist, reviewed the scan. While examining the scan, Chen noticed a "serpiginous metallic density that is located in the left rectus abdominis," which was the surgical site. Chen compared the September 29 CT scan to the scan performed before the surgery, and he noticed there were not any metallic densities in the pre-operative CT scan. Chen's September 29 report notes the presence of the metallic item, which "may represent postsurgical changes." Chen testified his report is primarily for the ordering physician (here, the emergency room doctor), but he would expect other physicians intimately involved in a patient's care to read his report as well. Chen never discussed his CT report with Santaella.

The emergency room physician and the hospitalist told Santaella that Abney-Acosta's CT scan showed a seroma, which Santaella thought was consistent with her symptoms; they did not tell Santaella the CT scan showed something metallic in Abney-Acosta's body. Santaella testified he did not request a copy of the September 29 CT scan or report because he spoke to the treating physicians. He explained: "All the communications from two independent doctors that were evaluating her indicated that she had a seroma, and her postoperative course was consistent with

that. So it would not typically be an image that we would request." He continued: "So we would not be prompted at that time, when we are seeing her, when everything is consistent and two independent doctors are letting us know that it's a seroma, we would not be prompted to look at the image or. . . get the report." Rather, "[n]ormally, if there was an unusual finding, people can get me. The E.R. doctor could call me. The hospitalist texted me. Dr. Chen could call me. So if there was anything unusual, the expectation from an independent provider, who is evaluating the patient, is to communicate those findings to me." Santaella agreed that if he had read the report, he would have seen the information about a metallic object inside of Abney-Acosta's body.

While Abney-Acosta was hospitalized, Santaella talked to a radiologist about installing a drain for the seroma. Abney-Acosta instead chose to have the seroma aspirated in Santaella's office on Monday, October 1. Abney-Acosta was discharged from the hospital on Sunday, September 30, and the seroma was manually aspirated in Santaella's office the following day. The aspiration relieved some pain and pressure Abney-Acosta felt. Santaella's October 1 notes state Abney-Acosta was doing well and recovering normally. Because the swelling returned, Abney-Acosta had the seroma aspirated again a few days later by a doctor in the medical office where she worked.

On Friday, October 5, Abney-Acosta woke up because her bedding and nightgown were wet and her abdominal area was leaking; she saw the incision had

opened. Santaella told her the wound needed to be packed with gauze. A doctor she worked with packed the wound, and the doctors she worked for continued to pack the wound until it healed in late December 2018.

Abney-Acosta saw Santaella again on October 24. She testified that, at that time, the pain had not improved and continued to limit her abilities to perform life functions. Santaella's notes from the October 24 visit indicate Abney-Acosta's pain was reduced; Santaella testified Abney-Acosta was doing well, her pain had improved, and she did not have any complaints at that time.

On November 7, 2018, Abney-Acosta saw Dr. Maushmi Sheth, a neurologist, about migraine headaches. She told Sheth she was experiencing neck and back pain, but she did not complain about abdominal pain. The medication list she provided to Sheth did not include any prescription pain medications. Sheth's notes indicate Sheth examined Abney-Acosta, found Abney-Acosta's abdomen was soft, nontender, nondistended, and bowel sounds were present.

When Abney-Acosta saw Santaella again on January 16, 2019, the surgical incision had closed, appeared to have healed, and was not draining. Santaella testified that, as of January 16, Abney-Acosta's preoperative symptoms had resolved, her incision was completely healed, there was no redness or sign of infection, and nothing was draining; he wanted her to return in four months. Santaella testified Abney-Acosta reported she was doing well. Abney-Acosta testified she was still in pain.

On March 6, 2019, Abney-Acosta consulted with a gastroenterologist, Dr. Vanessa Beckman, because she was having epigastric problems that pre-dated her September 2018 surgery. Beckman examined Abney-Acosta's abdomen, and her notes show Abney-Acosta's abdomen was soft, nondistended, nontender; Abney-Acosta had no palpable masses or hepatosplenomegaly. Beckman examined Abney-Acosta again on April 12 and noted the same results from her examination.

When Abney-Acosta saw Santaella on April 17, she told Santaella she was having abdominal pain. Santaella ordered a CT scan to determine the source of the pain, but Abney-Acosta chose not have the scan. Instead, she made an appointment with Dr. Minh Nguyen, a general surgeon.

Nguyen testified that Abney-Acosta came to his office on May 2, 2019, told him she had an abdominal surgery about nine months earlier, the surgery was difficult and there was a lot of bleeding, and everything else went well. She said she was in a lot of pain, rating it a six or seven on a ten-point scale, which limited her abilities to perform life functions. Nguyen viewed the September 29 CT scan and noticed an "S-shaped bright object in her abdominal wall." Based on Abney-Acosta's history and operation, Nguyen was suspicious the item was a retained sponge. Nguyen surgically removed the sponge on June 17, 2019. Abney-Acosta testified she "felt wonderful" after the surgery – "It was like [the pain] magically disappeared."

Nguyen testified Abney-Acosta's post-operative symptoms, including swelling, fluid collection, reopening of the surgical incision, and the site not healing timely or correctly, were "a hundred percent related to" the retained sponge. Nguyen testified a surgeon must obtain an accurate sponge count, and he never solely relies on the sponge count performed by other people.

Santaella testified that, based on his background, training, experience, and review of the records in the case, he believed he acted within the standard of care of a reasonably prudent doctor, and he did not negligently cause injury to Abney-Acosta. Instead, he believed the negligence of Darwin Bailey and Aubrey Magras caused the retained sponge.

### C.    Expert Witness Testimony

Dr. David Mayer, a general surgeon, testified Santaella departed from the standard of care by leaving a sponge in Abney-Acosta's body and in his post-operative treatment of her between September 29, 2018, and April 2019.

Mayer testified surgeons bear the primary responsibility for not leaving sponges in patients' bodies and cannot rely solely on the sponge count performed by the nurse or technician. Mayer testified: "Leaving a foreign body of gauze[1] in a patient is a 'never event' in medicine" when patient safety rules are followed.

---

[1] Mayer referred to the retained object as "gauze" while other witnesses called it a "sponge." For consistency, we use the term "sponge" except for direct quotations from Mayer's testimony.

Mayer explained surgeons have tools to prevent retained sponges. The sponge count performed by scrub technicians and circulating nurses is one of those tools, "and the surgeon participates in it by virtue of communicating with the scrub nurses or techs each time he puts a gauze sponge in the patient and leaves it there for a period of time, and so the team can ensure the gauze is removed." The communication with the surgical team is "an integral part of the sponge count." In this case, he did not see any indication that Santaella communicated information about placing and removing sponges. Mayer testified: "So this was a failure of communication, which was also a departure from [the] standard of care."

Mayer explained that another tool, "of equal importance, is wound exploration." At the end of every procedure, the surgeon has a duty to look in the wound. Mayer testified that "with proper wound retraction and manually feeling around in the wound and with good lighting and looking, an adequate inspection . . . it would be impossible to miss a gauze in the wound" because Abney-Acosta's incision was about four inches deep and three inches long, and the retained sponge measured 4 inches by 4 inches. He believed that, had Santaella adequately explored the wound, "it's impossible he could have missed it and left it there. So the only logical conclusion is, Dr. Santaella over-relied on the sponge count . . . and he did not do an adequate wound exploration. And that was below [the] standard of care."

Mayer disagreed with Santaella's statement that the sponge could have retracted under Abney-Acosta's muscle during the surgery; he explained Santaella's

–11–

theory "could only be true if the gauze pad was alive and moving. This is an inert object that you're putting in a wound. It stays in one place until it's either incorporated in the body or removed. It's not traveling. It doesn't have legs." He also testified "the gauze pad does not feel anything like normal tissue. It's rougher, and, you know, it has a distinct tactile and visual appearance." Thus, the surgeon can feel the sponge with a finger.

As to Santaella's post-operative care of Abney-Acosta, Mayer testified Santaella's failure to obtain the September 29 CT scan and report before Abney-Acosta's October 1 appointment "was a gross deviation from [the] standard of care." Viewing the CT scan or reading the report "would have immediately led to [Santaella] recognizing that he had left a gauze pad behind in the patient's wound." Mayer testified Santaella continued falling below the standard of care in his post-operative management when he saw Abney-Acosta again, she was not doing well, and there was fluid buildup requiring multiple aspirations.

Mayer explained that a foreign object left in a patient's body will cause fluid buildup. He believed the retained sponge caused the seroma, and Santaella should have recognized the existence of a problem and either looked at the September 29 CT scan or ordered another CT scan in the months he took care of Abney-Acosta. Although Mayer agreed a seroma can form even without a retained sponge, he explained a normal seroma, once aspirated, generally resolves within days or weeks; he explained that if the seroma had been independent of the retained sponge, it would

have disappeared after it was drained. However, when a foreign object causes a seroma, the seroma will not resolve and "it just eventually breaks through the skin and can drain and just remain present for many, many months until the gauze is removed, which is what happened here." Therefore, he concluded, in Abney-Acosta's case, the seroma was secondary to the foreign body irritation and inflammation, which was why the seroma persisted for months. Mayer stated: "But all of that is aside from the fact that this CAT scan shows there is a gauze left in the patient, and Dr. Santaella never bothered to even get the report or look at it, which is just as significant a departure from the standard of care as leaving it in the patient in the OR in the first place." Mayer testified Santaella "was almost willfully blind to the problems the patient was having."

Mayer agreed the written hospital policy states the sponge count is performed cooperatively between the circulating nurse and the scrub technician, the outcome of the sponge count is communicated to the surgeon, and there is a presumption the count will be accurate. He agreed hospital policy states the surgeon is not involved in the sponge count. Mayer agreed the failure of the hospital or staff to perform an accurate sponge count was negligent.

Dr. Edmond Clifford, a surgeon, testified Santaella practiced within the standard of care and was not negligent. Rather, Clifford believed Bailey and Magras failed to meet the standard of care and their negligence caused the retained sponge. Clifford testified a surgeon has no responsibility to count sponges; the surgeon is not

present when the sponges are being opened in the initial count, "and so you can't have somebody bear responsibility for a count when they are not there at the beginning."

Clifford testified the surgeon is responsible for performing the surgery, the scrub technician assists the surgeon by handing instruments back and forth and maintaining the counts, and the circulating nurse handles documentation. He assigned no responsibility to Santaella for the retained sponge. When asked who has responsibility to count the sponges, he replied: "It's a team. So the circulating nurse and the scrub technician do that before the operation, during the operation, and, essentially, at the close of the operation." As a surgeon, Clifford does not keep track of how many sponges go into and come out of a patient during his surgeries because his focus is completing the procedure safely and because the scrub technician and the circulating nurse are responsible for ensuring the patient does not have a retained sponge. He testified: "I make no effort to keep track of sponges during the procedures that I do." He did not believe Santaella was required to either.

Clifford testified the sponge left in Abney-Acosta's body was located in the same layer as the muscle and inside of the fascia. He explained that once the sponge is in the tissue, the surgeon may not find it even after performing a methodical inspection. Clifford testified Santaella was not negligent by not finding the sponge after a reasonable, methodical inspection "because . . . it potentially gets pushed out of view." And "[t]hat's the reason why you need a sponge count in this situation."

Clifford testified that nearly all seromas occur without a retained sponge, and he did not believe the seroma in Abney-Acosta's abdomen was related to the sponge. He believed, based on the information Santaella received about Abney-Acosta's visit to the emergency room and hospital, it was "completely reasonable" for Santaella to conclude her problems stemmed from a seroma "because his conclusion was that she had findings consistent with a seroma, and he had been told that the CAT scan showed a seroma." He testified Santaella had no duty to order a copy of the CT scan because Abney-Acosta's symptoms matched the information the other doctors told him about the imaging. "[E]verything is pointing in the same direction here. You've got a patient who is complaining of symptoms that is [sic] consistent with a seroma, and you've got imaging that is diagnostic of a seroma." Clifford stated Santaella had no reason to suspect, based upon being told the sponge count was correct, that Abney-Acosta had a retained sponge, and there was no reason for him to suspect that he needed to do anything further than treat the seroma.

Clifford testified that when Abney-Acosta began having symptoms again in April 2019, Santaella correctly ordered a new CT scan. Clifford did not think Santaella had any reason to order a CT scan before April 2019 because Abney-Acosta's symptoms were resolving.

### D.    Discussion

Jury Question 1 asked: "Did the negligence, if any, of those named below proximately cause the occurrence in question?" In response, the jury found Santaella

and Chen were not negligent, but Bailey and Magras were. On appeal, Abney-Acosta argues the evidence is legally and factually insufficient to support the jury's verdict as to Santaella.

The parties generally agree about the events surrounding Abney-Acosta's surgery and her post-operative care; which parties were responsible for the retained sponge and the failure to find it until the spring of 2019 was the contested issue at trial. Abney-Acosta's expert, Dr. Mayer, placed the blame for the retained sponge and failure to identify it squarely on Santaella; Mayer explained why he believed Santaella's treatment of Abney-Acosta during surgery and afterward fell below the standard of care. Mayer's expert testimony was countered by testimony from Bailey, Santaella, and Clifford. Bailey and Santaella testified Bailey was responsible for ensuring the sponge count was correct, Magras was responsible for documenting the count, and Santaella inspected the incision before closing. Santaella and Clifford explained that Santaella could rely on the sponge count provided by the scrub technician during surgery. They also testified Santaella could reasonably rely on the information he received from the emergency room physician and hospitalist about Abney-Acosta's condition after surgery, and Santaella did not act negligently by not reviewing the September 29 CT scan and report. Santaella's reports show Abney-Acosta's condition was improving in October, she did not request a refill of her pain medication, and the other medical professionals she saw did not identify any

abdominal concerns. The jury was free to credit testimony from Santaella, Clifford, and Bailey instead of Mayer's testimony.

Having reviewed all of the evidence and applying the appropriate standards of review, we conclude the evidence is both legally and factually sufficient. Abney-Acosta bore the burden of proof at trial, and the record does not conclusively establish all vital facts to support a negligence finding against Santaella. *See Porter*, 622 S.W.3d at 834 (legal sufficiency). Likewise, the jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Hizar*, 672 S.W.3d at 795 (factual sufficiency). We overrule Abney-Acosta's first issue.

## JURY CHARGE

In her second issue, Abney-Acosta argues the trial court erred by refusing to submit two negligence questions to the jury because she sought recovery on two distinct theories of medical malpractice based upon Santaella's negligence during surgery and, separately, his negligence during her post-surgical treatment. We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Id*. The omission of an instruction is reversible error only if the omission probably caused the rendition

–17–

of an improper judgment. *Id.*; TEX. R. APP. P. 44.1(a). Error in the omission of an issue is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment." *Shupe*, 192 S.W.3d at 579 (internal quotation marks omitted).

To succeed on either of her negligence theories, Abney-Acosta needed to obtain a jury finding that Santaella was negligent and his negligence proximately caused her injuries. *See Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 158 (Tex. 2022) ("to recover for medical malpractice, a plaintiff must prove 'to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant'"). Jury Question 1 asked the jury whether the negligence of any listed party, including Santaella, proximately caused the occurrence in question. By answering "no" as to Santaella, the jury determined either Santaella was not negligent or, if he was, his negligence did not proximately cause the occurrence in question. *See Shupe*, 192 S.W.3d at 579. The jury's answer to Jury Question 1 accounts for both theories of liability as Abney-Acosta describes them. Thus, "[t]he jury's negative finding on this question negated" any error committed by the trial court when it did not submit separate questions. *See id.* (concluding jury's negative finding on negligence claim negated any error by trial court in not submitting separate negligent entrustment claim). By specifically declining to find Santaella was negligent or that his negligence proximately caused the occurrence, the jury provided its answer to both queries—whether Santaella was negligent

–18–

during the surgery and whether Santaella was negligent in treating Abney-Acosta post-operatively. *See id.* Accordingly, we conclude the submission of separate questions would not have altered the verdict and any error was harmless. *See id.* We overrule Abney-Acosta's second issue.

CONCLUSION

We affirm the trial court's judgment.


220813f.p05

/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

EMILY ABNEY-ACOSTA,
Appellant

No. 05-22-00813-CV    V.

ROBERT SANTAELLA, M.D.,
Appellee

On Appeal from the 471st Judicial
District Court, Collin County, Texas
Trial Court Cause No. 471-00494-
2020.
Opinion delivered by Justice Nowell.
Justices Molberg and Pedersen, III
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 24th day of October, 2023.